STATE OF HAWAII, Plaintiff-Appellee, *v.* MAURICE FAULKNER, also known as Maurice W. Faulkner and Maurice William Faulkner, Defendant-Appellant

NO. 7363

NOS. 51524 AND 52040

DECEMBER 10, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

## OPINION OF THE COURT BY MENOR, J.

The defendant was convicted by a jury of disorderly conduct under HRS § 711-1101(1)(b), and of unlawfully carrying a firearm under HRS § 134-6. He appeals from the judgment and sentence of the trial court.

### I.

We will consider first the question of whether there was sufficient evidence to support the conviction of the defendant for disorderly conduct. The pertinent facts bearing on this issue are as follows: At approximately 4:30 p.m. on June 6, 1978, Officer George Garrett, acting pursuant to instructions, drove to the Monsarrat Avenue exit of the Honolulu Zoo. The defendant was parked in the zoo's exit driveway at the time, and when he saw the police vehicle approaching he stepped out of his own automobile to flag it down. He informed the officer that he was the individual who had called the police department with a complaint that someone had thrown an angle iron against his windshield. He pointed to one George Burmeister, who was standing inside the zoo on the other

side of the fence surrounding the premises, as the person responsible for the damage. Meanwhile, other officers had arrived. One of them, Officer Michael Church, climbed over the fence and brought Burmeister back to the scene. Because of the apparent hostility between the defendant and Burmeister, the officers kept the two men at a distance from each other while they attempted to ascertain the cause of their dispute.

In the course of the investigation, however, the police felt compelled to place the defendant under arrest for disorderly conduct. Regarding the defendant's actions prior to his arrest, Officer Garrett, the arresting officer, testified:

Q. What kind of conduct did Maurice Faulkner exhibit prior to his arrest?

A. Initially, I took it to be highly emotional state. After that it became one of belligerence and hostility towards myself and my fellow officers as well as the alleged suspect in the original case. And in addition to which after I had explained to him that there was a reason for my conducting my investigation and the manner I was going, and he continually stated that we were not doing our job properly, that we were fucking around with him rather than trying to do our jobs properly, and that we had been doing this for sometime, after I had repeatedly told him that this was the type of conduct that he was exhibiting, was not only improper but it was in total disregard to the people in the area, he continued in that manner.

The defendant was talking and arguing with the officer in a loud tone of voice, and this, according to the police, was attracting the notice of passersby and others who were waiting at the bus stop across the street on Monsarrat Avenue. Officer Garrett further explained, however, that the defendant was addressing his remarks exclusively to the officers and to Burmeister. Regarding the bystanders' reactions to the incident, Officer Joseph Ryan testified:

Q. Did any kind of crowd gather?

A. At the Shell parking lot there's a bus stop. There was quite a crowd at the bus stop. People were stopping at the zoo to see what was going on. Traffic on Monsarrat was slowing down and people were gawking.

HRS § 711-1101(l)(b), under which the defendant was charged, provides that "[a] person commits the offense of disorderly conduct

if, with intent to cause *physical* inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, he: . . . [m]akes *unreasonable noise.*" (Emphasis added)

Noise is unreasonable under the statute "if considering the nature and purpose of the person's conduct and the circumstances known to him, *including the nature of the location and the time of the day or night,* his conduct involves a gross deviation from the standard of conduct that a law-abiding citizen would follow in the same situation." HRS § 711-1101(2). (Emphasis added)

In this case the alleged offense took place in Waikiki at the entrance to a public zoo across the street from a public park. There were no private residences in the near vicinity. And because it was a weekday and the time was 4:30 o'clock in the afternoon, the noise level normally associated with the area was further raised and made more discordant by people on their way home from work. At another time and in a different setting, the defendant's conduct might have been disruptive of the serenity of the surroundings, but here the evidence has failed to demonstrate that his actions had contributed materially to the noise volume then being generated by the rush hour traffic. Added to this is the fact that he was understandably incensed that the angle iron thrown by Burmeister had cracked and pierced the windshield of his automobile. The defendant himself had called the police for assistance, and justifiably or not he became angry and frustrated over the manner in which they were proceeding to investigate his complaint. In these circumstances, we cannot say that a "law-abiding citizen" would not have conducted himself in a similar fashion.

Moreover, there is the further statutory requirement that the accused must have acted with the intent to cause physical inconvenience to, or alarm by, a member or members of the public, or that he acted with reckless disregard that his conduct might produce such a result. HRS § 711-1101(1)(b); *State v. Jendrusch,* 58 Haw. 279, 567 P.2d 1242 (1977). "That consequence which the statute seeks to prevent is actual or threatened physical inconvenience to, or alarm by, a member or members of the public." *Id.,* 58 Haw. at 281, 567 P.2d at 1244. Here, however, there has been no evidence presented by the State that the defendant's conduct had the effect of causing actual physical inconvenience to any member of the public. Neither, in the circumstances, was it likely that any member of the public

would have been physically disturbed or alarmed by the noise created by the defendant. Pedestrians stopping of their own volition to satisfy their curiosity, or motorists slowing down for the same reason, cannot be said to be physically inconvenienced or alarmed within the meaning of the statute. Moreover, it is not even clear from the record whether it was the *loudness* of the defendant's voice or whether it was the presence of four uniformed police officers and their vehicles at the scene that was drawing people's attention to the area. Probably, it was a combination of both.

It is obvious from the arresting officer's own testimony that it was the belligerent attitude and the language used by the defendant which was the officer's real concern. When asked about the proximity of onlookers to the scene, the officer replied that they were close enough to be *offended* by the defendant's conduct. While this was a proper subject for concern on the part of the police, it was not the type of conduct towards which the unreasonable noise provision of the statute was directed. Belligerency, when combined with persistently outrageous and abusive conduct, which unreasonably interferes with an officer's performance of his official duties, may supply the basis for a charge of harassment under HRS § 711-1106. *See State v. Vance,* 61 Haw. 291, 602 P.2d 933 (1979); *State v. Hopkins,* 60 Haw. 540, 592 P.2d 810 (1979). Coarse and obscene language directed at a member of the public, which is likely to provoke a violent response, may also furnish the basis for a charge under HRS § 711-1101(1)(c). *See State v. Jendrusch, supra.* But neither course of conduct would constitute disorderly conduct under the provisions of HRS § 711-1101(1)(b).[1] *Id. Cf. State v. Nakasone,* 1 Haw. App. 10,

---

[1] HRS § 711-1101 (1976 & Supp. 1980) in full provides:

Disorderly conduct. (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, he:

(a) Engages in fighting or threatening, or in violent or tumultuous behavior; or

(b) Makes unreasonable noise; or

(c) Makes any offensively coarse utterance, gesture, or display, or addresses abusive language to any person present, which is likely to provoke a violent response; or

(d) Creates a hazardous or physically offensive condition by any act which is not performed under any authorized license or permit; or

612 P.2d 123 (1980) (individual loudly arguing with a police officer in a fairly crowded restaurant, thereby causing a crowd to gather, was found from the evidence not to have been making an unreasonable noise within the meaning of the statute, or to have physically inconvenienced a member of the public or threatened to do so.)

## II.

The only other issue which merits this court's consideration is whether the police were authorized to conduct a warrantless search of the defendant's automobile following his arrest for disorderly conduct. Immediately after he was taken into police custody, he had been searched and handcuffed and placed in the arresting officer's car. Then with the car keys taken from him following his arrest, the police had opened and searched the trunk of his automobile. As a result of their search, a .22 caliber rifle was discovered and seized from the trunk of his vehicle. It was this discovery which led to the filing of the firearms charge against the defendant under HRS § 134-6.

In *State v. Elliott*, 61 Haw. 492, 605 P.2d 930 (1980), this court held that a warrantless search of an automobile would be proper where the police had probable cause to search at the time of the warrantless search and seizure, and they had reason to believe that because of the car's mobility or exposure, there was a foreseeable risk that it might be moved or that the evidence which it contained

---

(e)  Impedes or obstructs, for the purpose of begging or soliciting alms, any person in any public place or in any place open to the public.

(2) Noise is unreasonable, within the meaning of subsection (1)(b), if considering the nature and purpose of the person's conduct and the circumstances known to him, including the nature of the location and the time of the day or night, his conduct involves a gross deviation from the standard of conduct that a law-abiding citizen would follow in the same situation; or the failure to heed the admonition of a police officer that the noise is unreasonable and should be stopped or reduced.

The renter, resident, or owner-occupant of the premises who knowingly or negligently consents to unreasonable noise on his premises shall be guilty of a noise violation.

(3)  Disorderly conduct is a petty misdemeanor if it is the defendant's intention to cause substantial harm or serious inconvenience, or if he persist in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a violation.

might be removed or destroyed before a warrant could be obtained. This is the gist of the so-called "automobile exception" to the warrant requirement. *Id. See Coolidge v. New Hampshire,* 403 U.S. 443 (1971); *Chambers v. Maroney,* 399 U.S. 42 (1970); *Carroll v. United States,* 267 U.S. 132 (1925). To justify a warrantless search under this exception, it must be evident that the police had probable cause to search at the time of the search and seizure, and it must further be shown that exigent circumstances were the motivating factors behind the immediate search. *State v. Elliott, supra.*

In this case, the record shows that the police did have probable cause for their belief that the defendant was in possession of a firearm and that it was probably located in the defendant's automobile. Burmeister had told them that the defendant had brandished and threatened him with a rifle shortly prior to their arrival. He described the weapon he saw as one resembling a .22 calibre rifle. He was ostensibly speaking from personal knowledge and observation, and the police had no reason to disbelieve him at the time. The conduct and attitude of the defendant towards Burmeister, in the presence of the police, probably lent some credence to Burmeister's assertion that he had been threatened by the defendant. In the course of the investigation the defendant told Burmeister: "I'll get you." Acting on Burmeister's information, the police first searched the nearby bushes and shrubbery before proceeding to the defendant's vehicle. No appreciable length of time elapsed between the alleged offensive display of the weapon and the search of the automobile. Regarding the probability that the firearm was located in the trunk of the defendant's vehicle, Police Sgt. Henry A. Robinson testified:

Q. O.k. And anything else that [officer] Antenocruz tell you before you gave him permission to search the Maurice Faulkner vehicle?

A. No, other than the fact there was a rifle and he did not have — it was that in his car as far as we knew, it wasn't on him or with him when he was arrested. It wasn't in the bushes surrounding the zoo area there. And so, the logical place, if there was a rifle, possibly is in his trunk. I felt we had probable cause to continue to search into his trunk.

*See State v. Tygart,* 215 Kan. 409, 524 P.2d 753 (1974).

Exigent circumstances exist when, because of an automobile's

mobility or exposure, there is a foreseeable risk that it may be driven away or the evidence which it contains removed or destroyed before a warrant can be obtained. *State v. Elliott, supra.* Here, there was legitimate police concern for the security of the defendant's vehicle and its contents if left unattended. The automobile's windshield had been smashed. It was standing in the open on public premises next to a public street. The surrounding area was open to members of the public, as a park and entertainment area. Thus, although the car itself was locked, it was readily accessible and extremely vulnerable to vandalism. Because of its condition and location, there was a real risk of its being broken into, and its contents tampered with or removed, before the police could obtain a search warrant. The fact that the object of police interest was an inherently dangerous weapon must undoubtedly have also injected a sense of urgency into the situation. *See Cady v. Dombrowski,* 413 U.S. 433 (1973). Accordingly, we hold that the trial court did not err in applying the "automobile exception" to the warrant requirement. *State v. Elliott, supra; State v. Bennett,* 62 Haw. 59, 610 P.2d 502 (1980).

Reversed as to the conviction for disorderly conduct, and affirmed as to the firearms conviction under HRS § 134-6.

*Barbara Lee Melvin* for defendant-appellant.

*Kevin S. C. Chang,* Deputy Prosecuting Attorney, for plaintiff-appellee.