904 P.2d 552

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Kar Yin LEUNG, Defendant–Appellant.**

**No. 17123.**

Intermediate Court of Appeals of Hawai'i.

Oct. 18, 1995.

As Amended Nov. 1, 1995.

---

**15.** The trial court ordered Aloha Unlimited's    Complaint dismissed in the order.

Ronald T. Ogomori, Deputy Public Defender, on the brief, Honolulu, for defendant-appellant.

Donn Fudo, Deputy Prosecuting Attorney, City & County of Honolulu, on the brief, Honolulu, for plaintiff-appellee.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

Defendant–Appellant Kar Yin Leung (Defendant) was convicted of Disorderly Conduct in violation of Hawai'i Revised Statutes (HRS) § 711–1101(1)(b) (1993).[1] Following a judge trial, the trial court found Defendant guilty of the petty misdemeanor version of

---

1. Defendant was charged under the 1985 version of Hawai'i Revised Statutes (HRS) § 711–1101. In 1993, HRS § 711–1101 did not undergo any substantive changes other than the replacement of "he" with the gender neutral term "the per-

the charge [2] and entered judgment on March 22, 1993. Defendant timely filed his Notice of Appeal on May 19, 1993.

The pertinent portion of HRS § 711–1101(1)(b) states:

§ **711–1101 Disorderly conduct.** (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person:

.      .      .      .      .

(b) Makes unreasonable noise[.]

■ On appeal, we review the trial court's finding of guilt in a judge trial under the substantial evidence test. *State v. Hernandez*, 61 Haw. 475, 605 P.2d 75 (App.1980). Substantial evidence is " 'credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.' " *State v. Pone*, 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (quoting *State v. Batson*, 73 Haw. 236, 248, 831 P.2d 924, 931, *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992) (citation and brackets omitted)); *State v. Silva*, 75 Haw. 419, 432, 864 P.2d 583, 589–90 (1993). Because we conclude that the trial court's finding of guilt was not supported by substantial evidence, we reverse.

I.

At the trial, Officer Christopher Johnson (Officer Johnson) of the Honolulu Police Department (HPD) testified that on November 27, 1992, at approximately 8:20 p.m., he and three other HPD officers, including Officer John Valentino (Officer Valentino), responded to a dispatch call of "a hold-up alarm" at the Golden Harvest Theater located in the "Chinatown" area. The officers were met in the theater lobby by the theater manager, who had already detained Defendant and his three companions, two males and one female. According to Officer Johnson's testimony, the

manager explained to the police that the theater was not being "held up" but rather that the manager had heard a "loud popping noise, like maybe a fire cracker or something similar to a gun shot [sic]." The manager pointed to Defendant and his friends as "possible people that were causing this noise." Upon Officer Johnson's arrival at the movie theater, he observed that the movie "was still going on" with about five to seven minutes left until its conclusion.

Officer Johnson related that, as the manager tried to explain the situation to the officers, Defendant, "was cursing at the manager[,]" saying, " 'Fuck you, we ain't [sic] doing nothing. ... Fuck you, [w]asn't us. Fuck you. .... It wasn't us. You don't know what you're talking about. Fuck you people.' "

While Defendant continued to berate the manager, Officer Johnson reported that he told Defendant to "just relax [and] calm down," so that the officer could "get the story straight before ... accus[ing] anybody." As Officer Johnson resumed his conversation with the manager, Defendant once again interrupted by yelling "the same type of language." For a second time, Officer Johnson requested, "[J]ust be quiet. We'll get this straight." But according to Officer Johnson, Defendant disregarded the officer's request by yelling for a third time. This time, the officer himself "raised" his voice and warned Defendant to " '[j]ust be quiet, [already].' " Defendant, then standing "almost directly in front" of Officer Johnson, replied in a "[l]oud, kind of disorderly" voice, " 'Fuck you, you can't tell me what to do, fuck you.' "

Officer Johnson declared that both he and Officer Valentino warned Defendant to "be quiet" for a fourth time. Defendant again allegedly ignored the officers' admonitions and continued shouting obscenities. By this time, the movie had ended and people were

son." Therefore, the 1993 version is cited rather than the 1985 version.

**2.** Disorderly conduct may be punished as a petty misdemeanor or as a violation. HRS § 711–1101(3) (1993) states:

(3) Disorderly conduct is a petty misdemeanor if it is the defendant's intention to cause substantial harm or serious inconvenience, or if the defendant persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a violation.

beginning to leave the viewing area. Officer Johnson believed that Defendant "was kind of loud so that people outside started gathering affront [sic], looking into the lobby to see what's going on." Officer Johnson estimated "about a hundred" people gathered in front of the exit doors to look inside. When asked how many people had been in the theater watching the movie, the officer answered, "It was pretty full.... I'd say at least over a hundred."

Officer Johnson observed that the patrons exiting the viewing area "were moving ... slow[ly] [and] would slow down to turn around and look to see what was going on." The officers kept the people moving by telling them "there's nothing to see." Eventually, the theater emptied, but Officer Johnson believed the manager did not allow the people waiting outside for the second showing of the movie to enter the theater because Defendant and the police "were still ... engaged in ... loud conversation."[3] But on cross-examination, Officer Johnson admitted that he did not know exactly when the next movie was supposed to begin.

Officer Johnson testified that because of Defendant's behavior, he was unable to "reasonably" communicate with Defendant during the twenty-minute encounter in the lobby of the movie theater.[4] Officer Johnson indicated that "[a]fter [Defendant] cursed at [him], the first time, [it was] no problem, [and he] let him [Defendant] slide." When the officer warned Defendant, "You keep it up [and] you're going to get arrested," Defendant retorted, "'Fuck you, arrest me, whatever.'" At that point, Officer Johnson arrested Defendant. The officer stated that when he "grabbed" Defendant by the arm, Defendant began to yell even more, resisting the officer's attempt to arrest him. Eventually, it took two officers to "get him under control."

Officer Valentino arrived on the scene "almost at the same time" as Officer Johnson because they walked into the theater "together." Officer Valentino noted that "there [were] several people in the lobby area and outside [of] the theater waiting for the next show." He heard Officer Johnson ask Defendant "what was going on[,]" and Defendant reply, "'Fuck you, fuck these guys. I didn't do nothing.'" Officer Valentino reported that Defendant continuously swore in a loud voice until Officer Johnson arrested him for disorderly conduct.

---

3.    Q. [(Deputy Prosecuting Attorney)] Was the theatre eventually cleared out?
    A. [(Officer Johnson)] Yes.
    Q. And where were you at when the theatre cleared out?
    A. We're still in the lobby area.
    Q. And when the theatre cleared out, did they start letting people back in to the theater for the next movie?
    A. No.
    Q. Why was that?
    A. Because we're still—
    [(Deputy Public Defender)]: Objection, Your Honor, speculation.
    THE COURT: Objection's overruled.
    A. Because we're still in the lobby engaged in this loud conversation.
    Q. And how long—what period elapsed from the point the theatre was cleared til [sic] they started to let people back in?
    A. Well, they never let anybody in the whole time we're there. We're there for at least 20 minutes. And the second move [sic] didn't get started because of the incident in the hallway.
    Defendant's objection was proper and the testimony should have been excluded or stricken because no foundation was laid as to the basis for the officer's belief that "they" did not start

"letting people back in" because of the incident. Defense counsel's objection that the testimony was "speculation" was apparently an objection that the question "[c]alls for speculation." A. Bowman, *Hawai'i Rules of Evidence Manual* § 12.2, at 409 (1990). The basis for this objection is that a witness may not engage in "conjecture or speculate about the facts." *Id.*

4.    On cross-examination, Officer Johnson estimated that the police spent approximately a total of "45 minutes" with Defendant, but only about "20 minutes" in the lobby.
    Q. [(Defense counsel)] About how many minutes total would you say you were there from the first time you arrived and talked with the manager in the lobby and with the defendant and the other people to the time when you left?
    A. [(Officer Johnson)] Almost about 45 minutes.
    Q. 45 minutes?
    A. But the whole time wasn't spent in the lobby. We had them outside too·[be]cause we had to wait for the blue and white [police car] to transport [them to the station].... I'd say about 20 minutes of lobby time and other outside time in front of the movie theatre.

On cross-examination, Officer Valentino stated that when he arrived at the lobby of the theater, the movie was already over, and "everyone was out." When asked to estimate the number of people left in the lobby, Officer Valentino testified that "not including the four officers and the defendant ... maybe four or five" people remained, although there were people waiting outside the theater for the next movie. He estimated that the exchange between the officers and Defendant took place in the lobby area for "maybe five minutes[.]"

The State of Hawai'i's (the State) only witnesses were the two police officers. The theater manager did not testify. After the State rested, the court, "viewing the evidence in the light most favorable to the State and giving the State the benefit of all reasonable inferences therefrom," denied defense counsel's motion for a judgment of acquittal.

Defendant called Tracy Wong (Wong) as his first witness. Wong was a theater patron who was waiting outside of the theater for the second show. When she saw "the police cars coming" to the theater, she "ran to the front [of the line] to see." Wong declared that looking through the theater's "glass door," she saw a police officer with his arms around Defendant's neck, walking toward a stairway. Then she heard Defendant "scream real loud[.]" After the police took Defendant toward the stairway, Wong testified that she could not "really see inside the lobby" because the "stairway going in is [sic] two walls[.]"

Defendant's friend Han How Wang (Wang) testified next. Wang was with Defendant on the night of the incident. He testified that after he heard a "pop[ping] sound," the theater manager called Defendant and his friends out of the theater and the police showed up five minutes later. One of the officers "curse[d]" at Defendant, while two other officers stood by and "blocked" their view of Defendant. Wang observed one of the officers "used his hand to hold [Defendant's] neck[,] like push him up." Wang related that he heard yelling, but it was

Defendant calling for " 'help,' " and repeatedly asking the officer, " 'why, why?' "

Defendant was the last to testify. He stated that he, his girlfriend, his brother, and Wang were watching a movie when he heard "a loud pop and a sound." When the manager confronted his group, Defendant, in a Chinese dialect, denied making the noise. He recalled that after the police showed up, Officer Johnson was the one who used expletives at Defendant. Officer Johnson said to him, " 'Fuck you, fuck you, shut up.' "

According to Defendant, Officer Johnson then "crack[ed]" Defendant's neck, "pushed" him "on[to] the stair[s] so [that his] neck was real hurt [sic] at the time." When Defendant yelled, another police officer came over and "step[ped] on [his] hand." Defendant also claimed that he could not breathe because of the officer's neck-hold. Defendant was then arrested by the police. During cross-examination, Defendant denied causing the "popping noise" or using expletives against the police officers or anyone else.

After Defendant's testimony, the court denied defense counsel's motion for judgment of acquittal. The court found "the officer's" testimony more credible than the defense witnesses' and found Defendant guilty as charged.

## II.

■ We believe the dispositive issue is whether there was sufficient evidence to prove the state of mind element of disorderly conduct, that is, whether there was substantial evidence that Defendant acted "with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creat[ed] a risk thereof[.]" HRS § 711–1101(1).

## III.

Initially, we note that much of Defendant's alleged conduct falls outside the specific charge of disorderly conduct under HRS § 711–1101(1)(b). Defendant was not charged with using abusive language likely to provoke a violent response under HRS § 711–1101(1)(c) (1993).[5] Thus, his alleged

---

**5.** HRS § 711–1101(1)(c) (1993) states the following:

use of abusive language was not pertinent to the elements of a charge under HRS § 711–1101(1)(b).

Defendant was not charged with harassment for his conduct with respect to the theater manager under HRS § 711–1106 (1993).[6] "A person commits the offense of harassment if with intent to annoy or alarm another person he [or she] makes repeated communications in offensively coarse language." *State v. Vance*, 61 Haw. 291, 297, 602 P.2d 933, 938–39 (1979). *See* Commentary to HRS § 711–1106 (1993); *see also State v. Faulkner*, 64 Haw. 101, 637 P.2d 770 (1981). "Harassment, a petty misdemeanor, is a form of disorderly conduct aimed at a single person" as opposed to the public generally. Commentary to HRS § 711–1106 (1993).[7] Defendant was not charged with harassment of the police officers, although "[a]n individual police officer may ... be the object of harassment under [HRS] § 711–1106." Commentary to HRS § 711–1101 n. 1 (1993).

■ The State chose not to charge Defendant with harassment of the theater manager or of any of the police officers. By charging Defendant with disorderly conduct only, the State was foreclosed from arguing at trial that Defendant was guilty of harassing the manager and/or the officers because harassment is not a lesser included offense of disorderly conduct. *State v. Woicek*, 63 Haw. 548, 551, 632 P.2d 654, 657 (1981) ("[h]arassment is not a lesser included offense of disorderly conduct under HRS § 701–109(4)(a)"). Defendant's liability under HRS § 711–1101(1),

therefore, hinged on behavior tending to threaten the public generally, as distinguished from private alarm. *Cf.* Commentary to HRS § 711–1101 (1993).

■ On the other hand, the police, of course, cannot be considered "members of the public" for the purpose of establishing Defendant's culpability under the disorderly conduct statute. Arguments with the police, without more, do not fall within the ambit of the disorderly conduct statute:

> This is an important point. *A person may not be arrested for disorderly conduct as a result of activity which annoys only the police, for example.* Police officers are trained and employed to bear the burden of hazardous situations, and it is not infrequent that private citizens have arguments with them. *Short of conduct which causes "physical inconvenience or alarm to a member or members of the public" arguments with the police are merely hazards of the trade, which do not warrant criminal penalties.*

Commentary to HRS § 711–1101 (1993) (emphases added) (footnote omitted).

## IV.

■ We next examine the evidence which directly relates to the disorderly conduct charge. HRS § 711–1101 "requires proof of an intent to cause physical inconvenience or alarm [to the public] or at least a reckless creation thereof." Commentary to HRS § 711–1101 (1993). *See also State v. Nakasone*, 1 Haw.App. 10, 612 P.2d 123

§ **711–1101 Disorderly conduct.** (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person:
> ....
> (c) Makes any offensively coarse utterance, gesture, or display, or addresses abusive language to any person present, which is likely to provoke a violent response[.]

**6.** HRS § 711–1106 (1993) in pertinent part states the following:
> § **711–1106 Harassment.** (1) A person commits the offense of harassment if, with intent to harass, annoy, or alarm another person, that person:

> (a) Strikes, shoves, kicks, or otherwise touches another person in an offensive manner or subjects the other person to offensive physical contact;
> (b) Insults, taunts, or challenges another person in a manner likely to provoke an immediate violent response or which would cause the other person to reasonably believe that the actor intends to cause bodily injury to the recipient or another, or damage to the property of the recipient or another;
> ....
> (2) Harassment is a petty misdemeanor.

**7.** Although HRS § 711–1106 was amended in June 1992, this excerpt from the 1985 version of the Commentary to HRS § 711–1106 is still applicable.

(1980). Such "intent . . . , or recklessly creating a risk [of the prohibited consequences], is an essential ingredient of the conduct proscribed by the statute." *Nakasone,* 1 Haw. App. at 13, 612 P.2d at 124. *Accord State v. Jendrusch,* 58 Haw. 279, 281–82, 567 P.2d 1242, 1244 (1977). While a defendant's state of mind can rarely be proved by direct evidence, "the mind of an alleged offender may be read from his [or her] acts [or] conduct and [the] inferences fairly drawn from all [of the] circumstances." *State v. Sadino,* 64 Haw. 427, 430, 642 P.2d 534, 537 (1982).

Here, Defendant was detained in the theater lobby area. The crowd outside the theater was not attracted to the area by Defendant but was awaiting the start of the second showing of the movie. The crowd inside the theater was leaving the theater because the movie had ended. The fact that the crowd inside was moving slowly was to be expected in light of the number of people exiting the theater at the same time. While some of the patrons may have turned to "see what was going on," the Hawai'i Supreme Court has noted that "[p]edestrians stopping of their own volition to satisfy their curiosity . . . cannot be said to be physically inconvenienced or alarmed[.]" *Faulkner,* 64 Haw. at 105, 637 P.2d at 774. Similarly, theater patrons waiting for or exiting a movie who, of their own volition, stop or slow down to satisfy their curiosity about an encounter between Defendant and the police in a theater lobby cannot be said to be physically inconvenienced or alarmed.

Further, it is unclear from the record whether it was the action of Defendant or whether it was the presence of the four uniformed police officers and their vehicles at the scene that drew the crowd's attention. Wong specifically testified that it was the arrival of the police cars that attracted her to the "front [of the theater] to see" what was happening. It is reasonable to infer that the police officers' presence attracted the crowd's attention. *See id.*

There is no evidence that Defendant caused physical inconvenience to any member of the public or that the public was alarmed because at the time he allegedly made "unreasonable noise," he was under the control of the four police officers and the theater manager. Although people slowed down, they moved on when told by the police, "there's nothing to see." In *Jendrusch,* 58 Haw. at 282, 567 P.2d at 1244, the court pointed out that in amending the Hawai'i Penal Code in 1973, "the Legislature emphasized that mere *public* inconvenience, annoyance or alarm was insufficient to impose penal liability. There must have been the intent by the defendant to cause *physical* inconvenience to, or alarm by, a member or members of the public." (Emphases in original.) Assuming there was some inconvenience or alarm, there was clearly "no *physical* inconvenience or alarm" to any members of the public, nor do these surrounding circumstances give rise to the creation of a risk thereof.

In this case, Officer Valentino testified that he and Officer Johnson walked into the theater "together." Contradicting Officer Johnson's testimony, Officer Valentino indicated on cross-examination that when he arrived, most of the moviegoers had exited the theater and, excluding the four officers and Defendant, there were "maybe four or five" people remaining. He estimated the exchange between the officers and Defendant to have been brief, "maybe five minutes." Officer Valentino's testimony does not support any inference that Defendant's actions caused or created a risk of physical inconvenience or alarm by the public. No evidence was offered to show that Defendant specifically had the intent to produce the particular prohibited effect under HRS § 711–1101(1), or to recklessly create a risk thereof as required under *Nakasone.*

Finally, there is no evidence that Defendant addressed anyone other than the manager and the police. The State's brief, itself, states that "Defendant's . . . conduct was directed at the theater manager, as well as the officers," and that Defendant "acted belligerently" and in a "loud, . . . disorderly" voice. Officer Johnson plainly indicated that he arrested Defendant after Defendant ignored his warning regarding Defendant's repeated use of profanity at him and the other officers. This type of conduct is not an adequate basis for a charge under HRS § 711–1101, but would rather constitute a possible charge under HRS § 711–1106. It

is established that "[b]elligerency, when combined with persistently outrageous and abusive conduct, which unreasonably interferes with [a police] officer's performance of his duties, may supply the basis for a charge of harassment under HRS § 711–1106[,]" but not a charge of disorderly conduct. *Faulkner*, 64 Haw. at 105, 637 P.2d at 774. *See also Vance, supra.* The officers' testimonies indicated that all of Defendant's statements pertained to Defendant's belief that he was being unjustly detained and that the alleged profanity was aimed only at the officers and the manager, not at the public or any member of the public generally. *See* discussion in Part III, *supra.* We recently reversed a conviction for disorderly conduct under seemingly more egregious circumstances in *State v. Najibi*, 78 Hawai'i 282, 892 P.2d 475 (Haw.App.1995).[8]

Considering Defendant's alleged acts and conduct, and the inferences to be drawn from the surrounding circumstances, we conclude that a person of reasonable caution would not believe the evidence was adequate to establish that when Defendant addressed the theater manager and the police concerning what he believed to be an unjustified detention, his intent was to cause physical inconvenience or alarm by members of the public or that he recklessly created a risk thereof.

### V.

For the reasons stated above, the March 22, 1993 judgment is reversed.

---

8. In *State v. Najibi*, 78 Hawai'i 282, 892 P.2d 475 (Haw.App.1995), the defendant, in the afternoon traffic hour, stopped in the middle of a one-way street to talk to a truck driver. When a police officer observed that the defendant and the stopped vehicle "were impeding traffic and creating a traffic hazard," the officer attempted to remove the defendant from the street. When the defendant refused the police officer's request and replied using profanity, the officer arrested her. As the officer handcuffed the defendant's hands, she began to protest by "kicking" and "yelling" obscenities and threats. This scene "drew a crowd of fifty to seventy-five" people, causing "a pedestrian and vehicular traffic jam." This court reversed the defendant's conviction for disorderly conduct holding that there was insufficient evidence to convict the defendant under HRS § 711–1101.