*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-16-0000515
29-DEC-2021
08:40 AM
Dkt. 16 OP

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee,

vs.

SAMUEL K. KAEO,
Petitioner/Defendant-Appellant.

SCWC-16-0000515

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000515; CASE NO. 2DCW-15-0002103)

DECEMBER 29, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, WILSON, AND EDDINS, JJ.

OPINION OF THE COURT BY EDDINS, J.

On July 30, 2015, Samuel Kaeo took a stand - by lying down. Kaeo – his arms linked with those of other protestors through the insides of PVC pipes - laid in front of trucks scheduled to transport telescope components for the Daniel K. Inouye Solar Telescope (DKIST). (The telescope was then under construction on the summit of Maui's Haleakalā.)

The police disentangled Kaeo from the other anti-DKIST protestors and arrested him. About twenty transport convoy workers – all affiliated with, if not employed by, the DKIST – were inconvenienced by the protest.

Following a May 2016 bench trial, the District Court of the Second Circuit convicted Kaeo of disorderly conduct in violation of Hawai'i Revised Statutes (HRS) § 711-1101(1)(d) (2014).[1]

Kaeo appealed to the Intermediate Court of Appeals.

He argued that the State's evidence was insufficient.

One element of disorderly conduct is intending to cause (or recklessly creating the risk of causing) "physical inconvenience or alarm by a member or members of the public." Kaeo claimed that no *members of the public* were inconvenienced by his conduct. He argued that the twenty or so people involved in the transport convoy were not part of "the public" because of their work for the DKIST. The State disagreed. It said that HRS § 711-1100's (Supp. 2015) definition of "public" as "affecting

---

[1]     That statute reads:

> §711-1101  Disorderly conduct.  (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person:
>
> . . .
>
>     (d) Creates a hazardous or physically offensive condition by any act which is not performed under any authorized license or permit . . . .

or likely to affect a substantial number of persons" applies to HRS § 711-1101(1).  Despite their DKIST ties, the State maintained, the convoy workers were "members of the public" because they constituted a "substantial number of persons" affected by Kaeo's conduct.

Chief Judge Ginoza, joined by Judge Leonard, agreed with the trial court: the convoy workers were "members of the public" under HRS § 711-1101(1).  The ICA relied on HRS § 711-1100's definition of "[p]ublic" as "affecting or likely to affect a substantial number of persons."  It also considered the commentary to HRS § 711-1101, which it described as carving out an exception exclusively for police officers.  Since the convoy workers were not police officers, the ICA reasoned, they were "members of the public."

Because it found the convoy workers were members of the public, the ICA concluded that substantial evidence supported Kaeo's disorderly conduct conviction.[2]

---

[2]     The ICA also distinguished two previous cases in which it had overturned disorderly conduct convictions: State v. Leung, 79 Hawai'i 538, 904 P.2d 552 (App. 1995), and State v. Moser, 107 Hawai'i 159, 111 P.3d 54 (App. 2005).

In Leung, the ICA reversed the disorderly conduct conviction of a man who yelled and cursed at a theater manager and police officers in the Golden Harvest Theatre lobby.  There were about 100 patrons in the lobby's vicinity when the man had his outburst, but the ICA ruled their observation of the defendant's fit did not amount to physical inconvenience "because at the time [the defendant] allegedly made 'unreasonable noise,' he was under the control of the four police officers and the theater manager."  Leung, 79 Hawai'i at

Judge Nakasone dissented.  Unlike the majority, she did not think that the convoy workers were "'members of the public' within the meaning of HRS § 711-1101."  So she concluded there was insufficient evidence Kaeo intended to (or recklessly disregarded the risk that his conduct would) cause physical inconvenience to a member or members of the public.

Judge Nakasone recognized that HRS § 711-1100 defined the adjective "public" as "affecting or likely to affect a

---

544, 904 P.2d at 558.  This analysis suggested the theater manager – like the police officers – was excluded from the broader category of the "the public."

In distinguishing Leung from this case, the ICA majority explained that Leung didn't "analyze the theater manager as a member of the public because the manager had been the one to detain the defendant.  Further, the theater manager did not testify and thus there was no evidence from the theater manager whether the manager was physically inconvenienced or alarmed by the defendant."

The ICA also distinguished Moser.  In Moser, the ICA reversed the disorderly conduct conviction of a woman who had raised her voice while applying for a library card at the Kapa'a Public Library.  In reviewing the defendant's conviction, the ICA noted that the defendant's behavior was "considerably tamer" than that at issue in Leung and other disorderly conduct cases reversed on appeal.  Moser, 107 Hawai'i at 175, 111 P.3d at 70.  The ICA also noted that there was no evidence "that Moser addressed anyone other than [the library employees] on the occasion in question or intended to physically inconvenience or alarm any member of the public by speaking loudly."  Id.

In distinguishing Moser from this case, the ICA said that "[a]lthough Moser does not analyze the effect of the defendant's conduct on the library employee or the library manager, there is also no analysis or holding that these individuals could not be 'a member or members of the public' under HRS § 711-1101(1)."  The ICA also emphasized that "[u]nlike the current case, in Moser there was no evidence of physical inconvenience by anyone due to the defendant's conduct to support the disorderly conduct conviction based on unreasonable noise."

substantial number of persons."  But, she reasoned, grammar,[3]

semantics,[4] the commentary to HRS § 711-1101,[5] and the Model

----

[3]    Judge Nakasone said it would be ungrammatical to use HRS § 711-1100's definition of the adjective "public" to define the noun "the public" in HRS § 711-1101(1):

> Using the HRS § 711-1100 definition of the adjective "public" for the noun "the public" in the disorderly conduct statute leads to illogicality.  Applying this definition to the disorderly conduct charge here, the language in the Complaint would read, "Samuel K. Kaeo, with intent to cause substantial harm or serious physical inconvenience by a member or members of the ['affecting or likely to affect a substantial number of persons'], or reckless [sic] creating a risk thereof . . . ."  This does not make sense.

[4]    Judge Nakasone believed that if the words "the public" in the disorderly conduct statute are defined per HRS § 711-1100 as "affecting or likely to affect a substantial number of persons," then it makes no sense to apply the statute in a case where just one member of the public is affected.  One person is not a "substantial number of persons."  But the disorderly conduct statute – which criminalizes certain conduct committed with the "intent to cause physical inconvenience or alarm by a member or members of the public" – applies when just one member of the public is affected.

[5]    The commentary to HRS § 711-1101 provides, in relevant part:

> Subsection (1)(a) is a standard clause in disorderly conduct legislation, aimed at actual fights and at other behavior <u>tending to threaten the public generally, for this section requires public alarm, etc., as distinguished from the private alarm which may accompany assault</u>.  This is an important point.  A person may not be arrested for disorderly conduct as a result of activity which annoys only the police, for example.  Police officers are trained and employed to bear the burden of hazardous situations, and it is not infrequent that private citizens have arguments with them.  <u>Short of conduct which causes "physical inconvenience or alarm to a member or members of the public" arguments with the police are merely hazards of the trade, which do not warrant criminal penalties</u>.

HRS § 711-1101 cmt. (emphases added) (footnote omitted).

Judge Nakasone explained that this commentary makes clear that "[t]o fall within the scope of the disorderly conduct statute, a defendant's fighting behavior must be targeted *to the public generally* to establish the required public alarm element."  She said that the police are but one *example* of a group of people that is excluded from "the public generally."  Other

Penal Code (MPC),[6] all supported the conclusion that the word "public" in HRS § 711-1101 has its ordinary meaning: "community or ordinary people as a whole or in general, not belonging to a group or organization."

Judge Nakasone observed that Kaeo's conduct was "specifically directed at preventing a select group of individuals, the DKIST transport convoy, from egress out of the [the Baseyard]." Judge Nakasone said the DKIST transport convoy workers were not members of the general public. Rather, they were "a specific, select group of individuals engaged in a private transport." There was no evidence, she explained, that any members of the general public were "inconvenienced or recklessly placed at risk of inconvenience by Kaeo's conduct." So, Judge Nakasone concluded, there was insufficient evidence that Kaeo had committed disorderly conduct.

---

groups of private individuals, Judge Nakasone concluded, may also be excluded from "the public."

[6] Hawai'i's disorderly conduct statute is based on MPC § 250.2. Judge Nakasone noted that disorderly conduct under that section is "limited" to conduct that causes "public inconvenience or alarm."

The commentary to MPC § 250.2 states: "The Model Code does not authorize police intrusion into the home or place of business to control private misbehavior simply because it may be offensive to others. Instead, the offense is limited to persons who act purposely or recklessly with respect to public annoyance or alarm." Drawing on this language, Judge Nakasone argued that MPC § 250.2 excludes "private misbehavior" occurring in places such as a "home or place of business." These limitations, she suggested, reflect the MPC's assumption that disorderly conduct will impact "ordinary people" or some member of the public *at large*, as opposed to just "a substantial number of persons."

We reverse the ICA.[7]  The adjective "public" (defined in HRS § 711-1100) and the noun "public" (used in HRS § 711-1101(1)) mean different things.  Because HRS § 711-1100 effectively defines a different word than that used in the disorderly conduct statute, we look to the ordinary meaning of the noun "public" to determine its meaning.

The ordinary meaning of the noun "public" is the "community or the people as a whole."  See Public, The American Heritage Dictionary (5th ed. 2020).  Because of their DKIST affiliation, the convoy workers cannot, in the context of Kaeo's disorderly conduct charge, fairly be categorized as part of the "community or the people as a whole."  And because the State presented no evidence that Kaeo inconvenienced anyone other than the convoy workers, the trial court lacked sufficient evidence to convict Kaeo of disorderly conduct.

---

[7]  In his application for writ of certiorari, Kaeo also argues that the trial court erred in concluding he wasn't entitled to the choice of evils defense.  Under HRS § 703-302 (2014), "[c]onduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another" may, in certain circumstances, be justified.  The ICA considered this argument and unanimously rejected it.  In reaching this conclusion, it emphasized that the harm Kaeo sought to avert with his protest was not imminent: the DKIST's construction (and associated legal challenges) had been ongoing.  We agree with the ICA's analysis concerning Kaeo's choice-of-evils-defense argument.  The harms Kaeo sought to prevent through his conduct were ongoing: there is nothing immediate or urgent about a multi-year construction project.  The circuit court and ICA correctly concluded that Kaeo did not establish the essential elements of the choice of evils defense.

## I.  DISCUSSION

A.  **The noun "public" in HRS § 711-1101(1) has its ordinary meaning**

HRS § 711-1100 defines the adjective "public" as meaning "affecting or likely to affect a substantial number of persons." But it does not define the noun "public."

The word "public" appears in HRS § 711-1101(1) as a noun. See HRS § 711-1101(1) ("A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person . . . .").

The ICA majority defined the noun "public" in HRS § 711-1101 through reference to HRS § 711-1100's statutory definition of the adjective "public."[8]  The end result (though not spelled out in the ICA's opinion) is that its operating definition of the noun "public" is "a substantial number of persons affected or likely to be affected by the defendant's conduct."

Using this definition of "public" in the disorderly conduct statute makes the law incoherent.  If the State must show that

---

[8]     The ICA presumably took this approach because it would be ungrammatical to wholesale import HRS § 711-1100's adjectival definition of public into HRS § 711-1101(1), which uses the word as a noun.  Nouns are persons, places, or things; "affecting or likely to affect a substantial number of persons" is not a person, place, or thing.  And, as Judge Nakasone observed in her dissent, reading HRS § 711-1101(1)'s adjectival definition into HRS § 711-1101(1) renders the charging language in the State's Complaint nonsense.  See supra n.3.

the defendant's conduct affected a "substantial" number of persons, then why would the law specify that "disorderly conduct" may occur when just a single "member of the public" is inconvenienced? And why would the disorderly conduct statute refer to "members of the public" (plural) if the word "public" itself connotes a "substantial number of persons"? Cf. State v. Jones, 104 Hawai'i 481, 92 P.3d 490, 2004 WL 1430412 at *7 (June 21, 2004) (mem.) (Acoba, J., dissenting) ("Applying HRS § 711-1100's default definition of 'public' to HRS § 711-1101 places a paradoxical focus on the *number* of complainants involved, rather than on the *category* of complainants.").

The commentary also suggests that the statute uses the word "public" to refer to the public *generally*, meaning people who are unaffiliated with a particular private, personal, or commercial interest, and not just lots of people.

The commentary to HRS § 711-1101 provides, in relevant part:

> Subsection (1)(a) is a standard clause in disorderly conduct legislation, aimed at actual fights and at other behavior tending to threaten the public generally, for this section requires public alarm, etc., as distinguished from the private alarm which may accompany assault. This is an important point. A person may not be arrested for disorderly conduct as a result of activity which annoys only the police, for example. Police officers are trained and employed to bear the burden of hazardous situations, and it is not infrequent that private citizens have arguments with them. Short of conduct which causes "physical inconvenience or alarm to a member or members of the public" arguments with the police are merely hazards of the trade, which do not warrant criminal penalties.

HRS § 711-1101 cmt. (emphases added) (footnote omitted).

The commentary's juxtaposition of "public" and "private" alarm is important.  It suggests a definition of "the public" that turns not on numbers, but on affiliation with a discrete interest that is distinguishable from "the public generally."

As the ICA observed, the commentary distinguishes police officers from "the public" at large.  And it explains why the police, in particular, are excluded from "the public."  But nothing in the commentary suggests that other discrete groups of people can't also be excluded from "the public" on other grounds.  The commentary makes clear that the police are just an "example" of a group that is not part of the public.

Common sense too requires that HRS § 711-1101's definition of public hinges on something besides numerosity.  If we construe the word as meaning "a substantial number of persons affected or likely to be affected by the defendant's conduct," then an out-of-control brawl at a big family gathering could lead to multiple "disorderly conduct" convictions under HRS § 711-1101(1)(a)[9] – even if the melee happened at a private home and all the participants were family.  That makes no sense.

Construing HRS § 711-1101's use of "public" in light of HRS

_____

[9]    A person commits disorderly conduct under HRS § 711-1101(1)(a) if the person "with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof . . . [e]ngages in fighting or threatening, or in violent or tumultuous behavior."  See HRS § 711-1101(1)(a).

§ 711-1100's definition of the word would be appropriate if "public" the adjective and "public" the noun were merely "different syntactical forms of the same word." Cf. State v. Schmid, 859 N.W.2d 816, 821 (Minn. 2015) (explaining that "when 'take' and 'taking' are used in the same context, they have the same basic definition"). But as HRS § 711-1101, its commentary, and common sense show, the difference between "public" (the noun) and "public" (the adjective) is not just syntactical, it's semantic. Because of this distinction, the definition of "the public" in the disorderly conduct statute should not be determined by HRS § 711-1100's definition of "public."[10] A different definition for the noun "public" is "plainly required." See HRS § 711-1100 (providing that its definitions apply "[i]n this chapter, <u>unless a different meaning is plainly required</u>" (emphasis added)).

When a word isn't defined by statute, we determine its

---

[10] The Supreme Court's analysis in <u>FCC v. AT & T Inc.</u>, 562 U.S. 397 (2011), is instructive.

In <u>AT & T</u>, the Court considered the meaning of the adjective "personal" in Exemption 7(C) to the Freedom of Information Act, which concerns "personal privacy." AT & T argued that the statute's use of the word "personal" incorporated by reference the statutory definition of "person" (which included corporations). <u>Id.</u> at 402. The Court rejected this claim. In doing so, it explained that "in ordinary usage, a noun and its adjective form may have meanings as disparate as any two unrelated words." <u>Id.</u> at 403. The Court said that because the adjective "personal" had a meaning "distinct" from that of the noun "person," it should be given its ordinary definition, which concerned humans, but not fictional legal persons such as corporations. <u>Id.</u> at 402-07.

meaning by looking to its "ordinary and familiar signification" and "general and popular use."  See Wells Fargo Bank, N.A. v. Omiya, 142 Hawaiʻi 439, 449, 420 P.3d 370, 380 (2018) (cleaned up).  We can also consider "legal or other well accepted dictionaries."  See id. at 449-50, 420 P.3d at 380-81 (cleaned up).

In everyday speech, the noun "public" means "[t]he community or the people as a whole." Public, The American Heritage Dictionary (5th ed. 2020).  This is the meaning of the word "public" in HRS § 711-1101.

**B.    The DKIST convoy workers were not "members of the public" under HRS § 711-1101**

The record is unclear whether the DKIST formally employed the convoy workers.  But regardless of the workers' employment status, we know that they were at the Baseyard on July 30, 2015, for the same reason Kaeo was: the scheduled transport of telescope components to Haleakalā's summit.  They were not part of the "community or the people as a whole."  They were the subset of people tasked with facilitating the DKIST's construction.  They were the very group Kaeo targeted with his conduct.  This conceptual nexus between Kaeo's conduct and the convoy workers' presence at the Baseyard because of their DKIST ties precludes us from treating the convoy workers as "members

12

of the public."[11]

## C.  There is not substantial evidence supporting Kaeo's disorderly conduct conviction

To prove a defendant committed disorderly conduct under HRS § 711-1101(1)(d), the State must show the defendant acted with the "intent to cause physical inconvenience or alarm <u>by a member or members of the public</u>, or recklessly creat[ed] a risk

---

[11]    Despite the ICA's pronouncements to the contrary, this conclusion is consistent with both <u>Leung</u> and <u>Moser</u>.

<u>Leung</u> concerns a disorderly conduct conviction stemming from the defendant's altercation with a theater manager and some police officers.  The ICA reversed the conviction.  It ruled there was insufficient evidence that the defendant's "intent was to cause physical inconvenience or alarm <u>by members of the public</u> or that he recklessly created a risk thereof."  79 Hawai'i at 545, 904 P.2d at 559 (emphasis added).  In reaching this conclusion, the court considered testimony indicating that "the [defendant's] alleged profanity was aimed only at the officers and the manager, not at the public or any member of the public generally."  <u>Id.</u>  This reasoning shows that the <u>Leung</u> court did not consider the theater manager – a target of Leung's ire - a "member of the public" within the context of the disorderly conduct statute.  The ICA was wrong to conclude that <u>Leung</u> is distinguishable from this case because the <u>Leung</u> theater manager detained the defendant and did not testify.

The ICA's treatment of <u>Moser</u> is also unconvincing.  In <u>Moser</u>, the court reversed the conviction of a library patron who had raised her voice while speaking with a library employee and manager.  In determining that there was insufficient evidence "that Moser acted with any 'intent to cause physical inconvenience or alarm by a member or members of the public,'" the ICA observed that "there is no evidence in the record that Moser addressed anyone other than [the library employee and manager] on the occasion in question."  107 Hawai'i at 175-76, 111 P.3d at 70-71.  It also noted that "it is unclear whether any other patron was in the library that day and, if so, whether it was the raising of Moser's voice or the dialogue between Moser and [the library manager] that attracted the patron's attention."  <u>Id.</u>  The ICA's opinion in this case suggests that <u>Moser</u>'s holding turns on the mild nature of that defendant's conduct and leaves open the possibility that the library workers are "members of the public."  But this interpretation makes no sense given the <u>Moser</u> court's focus on the lack of evidence concerning people *besides* the library workers.  If the court thought the library workers were "members of the public," its focus would have been squarely on whether Moser intended to cause either of them physical inconvenience or alarm.

thereof." HRS § 711-1101(1) (emphasis added).

The convoy workers are not "members of the public" in the ordinary meaning of the term. And the State has not presented any evidence of actual inconvenience (or a substantial and unjustifiable risk of it) to anyone other than the convoy workers.[12] Kaeo's disorderly conduct conviction under HRS § 711-1101(1)(d) is therefore unsupported by substantial evidence.[13]

---

[12] The State argued in the alternative that *even if* no member of the public was actually inconvenienced by Kaeo's conduct, Kaeo was still guilty of disorderly conduct because he recklessly created *a risk* that some member of the public *might* be inconvenienced. This argument lacks merit. There is no evidence that there was a "substantial and unjustifiable risk" that a nighttime protest near the entrance to a private yard would inconvenience ordinary people in general. See HRS § 702-206(3)(c) (2014) ("A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result.").

[13] As we explained in State v. Martinez:

> We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

Id. at 101 Hawaiʻi 332, 338, 68 P.3d at 606, 612 (cleaned up).

## II.  CONCLUSION

As described above, we reverse the ICA's judgment on appeal and the district court's judgment and sentence.

| | |
|---|---|
| Hayden Aluli, for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Renee Ishikawa Delizo, for respondent | /s/ Sabrina S. McKenna |
| | /s/ Michael D. Wilson |
| | /s/ Todd W. Eddins |

