111 P.3d 54

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Hillary MOSER, Defendant–Appellant.**

**No. 25007.**

Intermediate Court of Appeals of Hawai'i.

March 31, 2005.

---

Erick T.S. Moon, on the briefs, for defendant-appellant.

Craig A. DeCosta, first deputy prosecuting attorney, County of Kauai, on the briefs, for plaintiff-appellee.

WATANABE, Acting C.J., LIM, and FOLEY, JJ.

Opinion of the Court by WATANABE, Acting C.J.

In this appeal, we have been asked to determine whether Defendant–Appellant Hillary Moser (Moser) was properly convicted of the petty misdemeanor offense of disorderly conduct, in violation of Hawaii Revised Statutes (HRS) § 711–1101 (1993), based on her conduct in speaking loudly in a public library, a place generally recognized in the community as a place of quiet.

Based on our review of the record, we agree with Moser that there was insufficient evidence adduced at trial to convict her of the offense.

## BACKGROUND

On October 5, 2001 in the District Court of the Fifth Circuit (the district court), Moser was charged by written complaint with one count of disorderly conduct based on unreasonable noise and one count of simple trespass,[1] as follows:

> COUNT I: On or about the 14th day of September, 2001, in the County of Kauai, State of Hawaii, HILARY MOSLER [sic], with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, did make unreasonable noise, thereby committing the offense of Disorderly Conduct in violation of Section 711–1101(1)(a) of the [HRS].[2]

> COUNT II: On or about the 14th day of September, 2001, in the County of Kauai,

---

1. The District Court of the Fifth Circuit dismissed the simple trespass count, stating that the prosecution had failed to prove this offense beyond a reasonable doubt. This count is not at issue in the appeal.

2. Hawaii Revised Statutes (HRS) § 711–1101(1)(a) (1993) provides:

 **Disorderly conduct.** (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person:

 (a) Engages in fighting or threatening, or in violent or tumultuous behavior[.]

 Since disorderly conduct by "[m]ak[ing] unreasonable noise" is codified in subsection (b), not subsection (a), of HRS § 711–1101(1), Count I's reference to subsection (a) was incorrect. However, it does not appear from the record that Defendant–Appellant Hillary Moser (Moser) was prejudiced by the error.

State of Hawaii, HILARY MOSLER [sic] did knowingly enter or remain unlawfully in or upon premises, to wit: Kapaa Public Library, thereby committing the offense of Simple Trespass in violation of Section 708–815 of the [HRS].

(Footnote added.)

### A. *The Trial*

Moser's trial was held before the district court[3] on December 13, 2001. The following relevant testimony was presented:

#### 1. *Sharon Paik's Testimony*

Sharon Paik (Paik), an employee of the Kapaa Public Library (the library), related that on the afternoon of September 14, 2001, she was working at the circulation desk of the library when Moser approached and inquired about applying for a library card. Paik directed Moser to the table where the application forms were located, and Moser filled out a form and returned it to Paik.

As Paik input the information on the application form into her computer, she noticed that there was an illegible entry on the line that requested Moser's middle initial. Paik asked Moser if the entry was an "I". In response, Moser became upset and, in a raised voice, said, "With everything that's happening in this world today,[4] what does it matter if this is an 'I'?" Paik reported that Moser's facial expression looked "angry." Moser was using a tone and volume of voice louder than what the library staff "normally [were] accustomed to hearing in the library." Generally, patrons speaking that loud are "asked to be quiet[.]"

Paik "calmly explained that [the library] needed to verify the information on [Moser's] application form because sometimes [the library has] patrons with the same name." Paik then finished processing the library card and gave it to Moser.

Paik related that her supervisor, Dale Huber (Huber), came out to the circulation desk area after he heard the commotion. When Huber spoke to Moser and instructed her to lower her voice, Moser became upset.

On cross-examination, Paik stated that Moser was soft-spoken when Moser first approached the circulation desk but was "shouting" when she became upset. Paik stated that the door to the workroom[5] where Huber was in was open, that the workroom was fairly close by, and that conversations taking place at the circulation desk could often be heard in the workroom if the door were open. Paik described the exchange that took place between Moser and Huber:

Q. . . . Now, you say that [Huber] came out and he—he asked [Moser] to lower her voice?

A. Mm-hmm.

Q. And you said also that she did not lower her voice?

A. Mm-hmm.

Q. Was her voice when she was speaking more loudly than she normally speaks? Did she raise it even louder than that when [Huber] addressed her or was it about the same?

A. I don't recall.

Q. Did you hear [Huber] ask her to leave the library?

A. Well, yes, I did.

Q. Okay. What—what did he say to her, if you can recall?

A. Okay. I think, you know, he—he said something like he didn't appreciate her speaking, you know, to—to the employees like that. And—and, you know, she asked—she said and who are you, you know, and he said that he was the head of the library, mm-hmm.

Q. And did—

---

3. Judge Trudy K. Senda presided.

4. The incident that gave rise to the charges against Moser took place three days after the September 11, 2001 attacks on the World Trade Center in New York City.

5. The room in which Dale Huber (Huber) was in when he heard the commotion at the circulation desk was described at trial by Sharon Paik as "the back room" and "our workroom in the back[,]" by Huber as the "back room[,]" and by the deputy prosecuting attorney as "[Huber's] office[.]"

A. Oh, I'm sorry. She—she said she needed to speak to the person in charge or something and then he said that she was.

Q. Okay. During the conversation she, [Moser], said I want to speak to the person in charge and he said oh, that's me?

A. Uh-huh.

Q. So how long after he came out of his office did you request that [Moser] leave the library?

A. Well, I don't remember.

Q. Was it longer than a minute?

A. Mm-hmm, I would say, yes.

Q. Longer than two minutes?

A. (Audiotape blank.)

Q. Did you hear [Huber] tell [Moser] if you don't leave I'm going to call the police?

A. Yes.

Q. Did you hear [Moser] respond? What—what did she say?

A. She said she wanted him to call the police.

Paik testified that Huber then called the police, and Moser waited in the library, without incident, until the police arrived. When the police arrived, they asked Moser to step outside; Paik did not see where they went after they exited the library.

Paik could not remember if there were any other library patrons nearby during the incident. She did note, however, that her co-workers would have been able to hear Moser. She also stated that while Moser was at the circulation desk, no other patrons came up to ask Moser to be quiet. Additionally, Paik did not know of anyone commenting about Moser's loudness. On cross-examination, Paik admitted that Moser's voice was not the loudest she had ever heard in the library.

## 2. *Huber's Testimony*

Huber, the librarian and branch manager for the Kapaa Public Library, testified that at approximately 3 p.m. on September 14, 2001, he "was in the back room working when [he] heard somebody outside behind the circulation desk raise her voice so [he] went out to investigate the situation." Huber noted that he heard Moser's voice even though he is hard of hearing and wears hearing aids.

According to Huber, the back room was about fifteen to twenty feet away from the circulation desk and the door to the room "was open, as always[.]" Two other library staff members were in the back room with him. Huber could not recall if there were any patrons around when the incident occurred but did relate that a woman approached him later and "made a comment to [him] about what had happened."

Upon questioning by the deputy prosecutor, Huber related what happened during his interaction with Moser:

Q. And what did you say when you walked out [of the back room]?

A. Well, basically I walked out to the—into the room and I saw that my staff member, [Paik], was interacting with [Moser]. And [Moser] was clearly very upset about what was going on and she mentioned something to the effect of about her middle initial which she didn't, you know, it's an I, it's not an L, you know, it's clearly what it is, you know. And I thought that was kind of interesting that she would be so upset about something like her middle initial, you know, whether to delete it or not.

Q. Did you talk with [Moser]?

A. At that point I did not say anything.

Q. When did you talk with [Moser]?

A. Well, basically what happened was is that [Paik] continued to process the library card application and speak to [Moser] and, you know, I just sit there and—sat there and witnessed it. And I said to myself if she's getting upset over something as, you know, inconsequential as a middle initial whether we can read it, you know, or not, whether it was an I or an L, how is she going to react to a library fine?

So after we gave her the card, I said to her, I says, you know, I don't think your behavior was very appropriate right now.

Q. Did you ever ask [Moser] to lower her voice?

A. At that point, you know, she—at that point I did because, you know, she, you know, she asked me to identify who I

was, she wanted to speak to the person in charge. I says I am in charge, says right now you're creating a disturbance, if you do not lower your voice, I'm going to have to ask you to leave.

Q. Did Miss Lewis—excuse me, did [Moser] lower her voice?

A. No, she did not.

Q. What did she do?

A. Well, based—I don't know exactly what she said but basically, you know, she continued on the same vein, you know, like she was clearly upset and was, you know, very upset about the situation.

Q. Did you ask her to leave?

A. I eventually asked her to leave because she did not, you know, she did not listen to me when I asked her to tone it down.

Q. Did she leave?

A. She did not.

Q. How many times did you ask her to leave?

A. I asked her once to leave. And I said the second time, I says if you don't leave now I'm going to call the police. And at that point she refused to leave so I called the police.

Huber also testified that the library is "usually very quiet because people like to, you know, read in quiet[,]" but "unfortunately, the acoustics are such that ... it doesn't take much noise to bounce off the walls and the ceiling to ... make some sort of like loud noise in the library." He also explained that when the police arrived,

[t]hey basically went to [Moser] and they said—you know, I told them the situation and they went up to [Moser] and [the policeman] said to her, he says well, we have to take it outside and we discuss this outside. And she says no, and she—he says we have to take this outside and then she followed him.

On cross-examination, Huber related that after approaching Moser, he told her "that there are rules of conduct in this library and how she acted then was inappropriate." Additionally, he told Moser that he wanted "to make it very clear" that if "she comes back and does a similar behavior that it was not appropriate." At that point, Moser "proceeded to get upset all over again."

Huber also testified that since he was in charge of the branch, it was his responsibility to ask patrons who engage in behavior "deemed disruptive by the library staff ... to leave" the library. Because Moser did not curb her behavior, Huber asked her to leave. When Moser did not leave, Huber told her he was "going to have to call the police. And she said go ahead, so [Huber] did."

Huber stated that after he had called the police, he "probably wandered around the library trying to continue [his] work" and that Moser used the library quietly until the police arrived.

### 3. *Officer Thomas Metcalfe's Testimony*

The third and final witness for Plaintiff-Appellee State of Hawai'i (the State) was police officer Thomas Metcalfe (Officer Metcalfe). Officer Metcalfe stated that he came in contact with Moser at "around 2, 3 in the afternoon" of September 14, 2001, while responding to a disturbance call at the Kapaa Public Library. Officer Metcalfe reported that when he arrived, Moser was outside the library with another officer, who was first to respond to the call. Shortly thereafter, that officer left, and Officer Metcalfe took responsibility for the call. Officer Metcalfe testified that he asked Moser to leave about seven or eight times and explained why she had to leave. However, Moser "[e]ither ignored or explained that she didn't have to leave, she had the right to be there, and that she intended to go back into the library."

On cross-examination, Officer Metcalfe admitted that he had not witnessed Moser's alleged disorderly conduct inside the library. He explained that when he arrived at the library, Moser was being "disorderly" by "being uncooperative" and not complying with the other officer's request that she leave the library premises. Officer Metcalfe stated that he told Moser to leave and when she "refused that order two more times," he arrested her for trespass.

**164**

### 4. *Moser's Testimony*

After the State rested, Moser took the stand in her own defense. Moser related that she had gone to the Kapaa Public Library on September 14, 2001 "to get some recreational and study materials[.]" Knowing that she needed a library card to obtain these materials, Moser asked Paik for an application form for a library card. Paik pointed out where the forms were, and after filling out a form, Moser gave it to Paik, along with her Hawai'i driver's license.

Moser described what transpired next, as follows:

> Q. And when you put down the application and your Hawaii driver's license down in front of her, what happened then?
>
> A. [Paik] asked me is this an "I" after Hillary [sic] and I said yes, it is.
>
> Q. And then?
>
> A. And then I was looking for something in my purse and I thought what are you looking for, and I thought I'm looking for me. And I thought well, come out. So I did ask [Paik] very softly because there's a lot of tremor on the planet on the 14th, and I did ask her very quietly if you consider the condition of the planet today, is the "I" important? And she said yes, perhaps someone else has your same name. And I said yes, that is probable because my last name is common that my first name is uncommon, so would you think it's important? And she was about to respond and this man came out of there and said are you disrupting my staff?
>
> . . . .
>
> Q. And what did you—what did you say to him?
>
> A. I said we're talking about my name and he said leave. And I said why? And he said do you want me to call the police? And I said no. I do believe that any problem can be resolved through communication which is what we are doing here. And then I looked into his face and he looked obdurate and I said, sir, if that was your only recourse and solution to this problem, then I guess [that's] what you're going to have to do.
>
> Q. You mean call the police?

> A. Yes. So then [Paik] and I finished our business and she gave me the card and I went further into the library. But then I was very shocked and I didn't know what to do, either to wait for the policeman or leave. And I waited. And when he came I introduced myself to him and shook his hand and we both agreed to go outside, we both said together let's go outside. So we went outside.
>
> Q. This policeman wasn't the policeman who came here to testify?
>
> A. No.
>
> Q. Okay. And you—you went outside with the policeman—
>
> A. Yes.
>
> Q. —and you were having a discussion with him?
>
> A. Yes.
>
> Q. What was the discussion about?
>
> A. Well, I thought he was being a bit—treating me like a disruptive person so I thought when he has a moment he'll ask me what happened and then he can see I wasn't disruptive in this instance. But he never did ask me.
>
> Q. Mm-hmm. What did he ask you? Did he ask you to leave?
>
> A. Not at that stage. We were just walking down the ramp and this way and then I said would you like to ask me what happened. But he—he didn't have get 'round to asking me.
>
> Q. Did the officer arrive, the other officer that was here testifying, did he come then?
>
> A. A little later.
>
> Q. Mm-hmm.
>
> A. We were sitting on the bench and we were talking, I was trying to calm down because I didn't feel good.
>
> Q. Mm-hmm.
>
> A. And I think he asked me—I don't know if he asked me to leave before or after the other officer was there, I don't remember, but I didn't want to leave, I wanted to stay sitting because I didn't feel good.
>
> Q. Okay.

A. And I thought if I stand up, I'll fall over. I didn't tell him that because I felt undignified. So I waited, I was trying to gather myself.

Q. You were—you were upset?

A. Shocked.

Q. Shocked, okay. And then the other officer who—he testified, he came on the scene?

A. Yes.

Q. And he asked you to leave?

A. I don't remember which of them asked me to, but they said leave the premises. And I said I need to sit here.

Q. Did you hear any one of them say leave the premises or you will be arrested?

A. I think so.

Q. Okay. And at that time you felt, you said, that you needed to rest a little?

A. Yes, yes.

Q. But you didn't tell the officer that?

A. Yes.

Q. Why didn't you tell the officer?

A. I did say.

Q. Oh, you did tell the officer?

A. Yes. I said I need to sit here. I don't feel good, I need to sit here. I didn't say that if I stand up I might fall over, I didn't say that.

Q. Mmm, okay, but you told him that you need to just sit there and rest?

A. Okay.

Q. Okay. And then what was his response?

A. I don't know. The next thing he was dragging me to the car and I said you don't have to drag me, I can walk. And he said you're resisting arrest. And he handcuffed me and he threw me in the car and slammed the door and my glasses went flying over there. And he said to me, screamed at me, go back to South Africa. So that's what happened there.

Q. Okay. Do you recall during the conversation that you had mentioned to him that you had been in South Africa?

A. Yes, because I was sitting on the bench and I was trying to feel better and I was beginning to breathe and feel their aloha of the island and with the principle of huna. And then this sort of came into the present time, this is not South Africa, this is not police brutality. And I said oh, officer, this is nothing, I'm from South Africa. I kept expecting any minute—you know like when you're having a bad dream, you expect any minute when you wake up? I expected any minute one of us would wake up and just be there comfortably and perceive.

No new information was brought to light during cross-examination.

B. *The District Court's Decision and Post–Verdict Proceedings*

Following brief closing arguments by counsel, the district court dismissed Count II (simple trespass) but found Moser guilty of Count I (disorderly conduct):

THE COURT: Okay. I do not find that [the] State has met its burden with respect to Count II because I don't believe that the State has proved beyond a reasonable doubt the state of mind that's required in that the defendant must knowingly enter or remain unlawfully in or upon [the] premises.

The testimony that's come out through [Moser], as well as through the other witnesses, do not in my opinion establish beyond a reasonable doubt that she knowingly entered or remained—remained unlawfully in the premises. And so as to Count II, judgment for [Moser] is rendered.

However, as to Count I, the [c]ourt does feel that the State has met its burden of proof beyond a reasonable doubt for the Disorderly Conduct charge. Now, the question that was in my mind originally— because I do find that it was an unreasonable level of noise that was created based on the testimony of [Huber] and [Paik].

[Paik] testified that the—that the noise level of the loud voice level and the conversation lasted for at least a few minutes. [Paik] testified that although it wasn't the loudest voice she had ever heard in the library, it was loud enough to be of that— that level that the person would have been asked to leave or lower their voice. So I

do find that it was an unreasonable level of noise within the Disorderly Conduct statute.

The question that I had in my mind was whether or not the State had proved a petty misdemeanor or simply had proved a violation under subsection 3. The petty misdemeanor requires that the defendant must intend to cause substantial harm or serious inconvenience. I don't—or let's deal with that first. I don't find that the State has proved beyond a reasonable doubt that [Moser] intended to cause substantial harm or serious inconvenience.

However, Disorderly Conduct can be a petty misdemeanor if the defendant persists in disorderly conduct after reasonable warning or request to desist. Based on the testimony of [Huber] in which [Moser] was asked more than once to lower her voice or asked to leave, to desist in that behavior, I do believe that the State has met its burden of proof beyond a reasonable doubt with respect to a petty misdemeanor of Disorderly Conduct. And, therefore, I find [Moser] guilty of Count I, Disorderly Conduct as a petty misdemeanor.

On December 21, 2001, Moser filed a Motion to Vacate Finding of Guilt as to Count I. Moser argued that there was "no evidence ... presented to prove to the court that [Moser's] intent in speaking in a loud voice was to cause physical [inconvenience] or alarm by a member or members of the public, or recklessly creating a risk thereof." Moser further argued that "[t]here was insufficient evidence to prove that [at the time of the incident,] there were any other people in the public [l]ibrary other than [Moser], [Huber,] or his staff" who were placed at risk of physical inconvenience.

Following a January 24, 2002 hearing, the district court orally denied the motion to vacate and sentenced Moser to pay a $50 fine and a $25 criminal injury fee.

On February 19, 2002, the district court entered its "Findings of Fact; Conclusions of Law; Order Denying [Moser's] Motion to Vacate Finding of Guilt as to Count I[.]" The district court made the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. On September 14, 2001, in the afternoon, [Moser] entered the Kapaa Public Library and requested a library card from [Paik].

2. [Paik] directed [Moser] to complete certain forms.

3. Upon receiving the forms from [Moser], [Paik] questioned [Moser] about her middle initial.

4. [Moser] took offense, believing this to be unimportant in light of world events, and raised her voice to [Paik].

5. The library is normally a quiet place.

6. [Moser's] voice was louder than normal for the library.

7. [Moser's] voice brought the branch manager, [Huber], who is hard of hearing, out of his office to request that [Moser] lower her voice.

8. [Moser] refused to lower her voice.

9. [Huber] further explained that [Moser's] loud voice and behavior was inappropriate for the library.

10. [Moser] continued to talk loudly.

11. [Huber] requested that [Moser] leave the library.

12. [Moser] refused.

13. At the time of the incident, there were three staff members working in the library.

14. Further, a patron of the library approached [Huber] after the incident and commented upon it.

### CONCLUSIONS OF LAW

1. The facts in *State v. Faulkner*, 64 [Haw.] 101[, 637 P.2d 770] (1981), *State v. Najibi*, 78 [Hawai'i] 282[, 892 P.2d 475] (App.1995) and *State v. Leung*, 79 [Hawai'i] 538[, 904 P.2d 552] (App.1995) differ than those in the case at bar and thus their holdings are not precedent.

2. There is substantial evidence to support the [c]ourt's guilty verdict as to Count I.

Moser filed a Notice of Appeal on March 14, 2002, and the appeal was assigned to this court on November 4, 2002. On January 27, 2005, the case was temporarily remanded to the district court for entry of a separate written judgment, pursuant to *State v. Bohannon*, 102 Hawai'i 228, 236, 74 P.3d 980, 988 (2003). On February 2, 2005, a written Judgment was entered that memorialized the district court's oral pronouncement on January 24, 2002, convicting Moser of, and sentencing her for, disorderly conduct.

## DISCUSSION

### A. *Moser Was Improperly Convicted of the Petty Misdemeanor Offense of Disorderly Conduct*

▉ We note at the outset that Count I of the Complaint charged that Moser,

with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, did make unreasonable noise, thereby committing the offense of Disorderly Conduct in violation of Section 711–1101(1)(a) of the [HRS].

The Complaint did not charge Moser with disorderly conduct as a petty misdemeanor,[6] nor allege any operative facts that would apprise Moser that she was being charged with the petty misdemeanor offense. Since Moser was not charged with disorderly conduct as a petty misdemeanor, we conclude that the district court improperly convicted her of said offense.

We turn then to whether there was sufficient evidence to convict Moser of disorderly conduct as a violation.

### B. *There Was Insufficient Evidence to Convict Moser of Disorderly Conduct as a Violation*

The Hawai'i Supreme Court has repeatedly stated that

evidence adduced in the trial court must be considered in the strongest light for the

prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (brackets omitted) (quoting *State v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). The supreme court has also stated that " '[s]ubstantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v. Jones*, 96 Hawai'i 161, 181–82, 29 P.3d 351, 371–72 (2001) (quoting *State v. Eastman*, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996)).

In evaluating Moser's insufficiency of the evidence claim, therefore, our first step is to determine the material elements of the offense with which she was charged.

### 1. *Material Elements Analysis Under the Hawaii Penal Code*

Pursuant to HRS § 702–205 (1993), the material elements of an offense

are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:

(a) Are specified by the definition of the offense, and

(b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

The term "[c]onduct" is defined in HRS § 701–118(4) (1993) as "an act or omission, or, where relevant, a series of acts or a series of omissions, or a series of acts and omissions[.]" Further, HRS § 701–118(2) defines "[a]ct" as "a bodily movement whether voluntary or involuntary[,]" and HRS § 701–118(3)

---

6. HRS § 711–1101(3) (1993) states:
 **Disorderly conduct.** . . .
 .(3) Disorderly conduct is a petty misdemeanor if it is the defendant's intention to cause substantial harm or serious inconvenience, or if the defendant persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a violation.

defines "[o]mission" as "a failure to act[.]" The Hawaii Penal Code does not define the terms "attendant circumstances" or "results of conduct[.]"

The Commentary on HRS § 702–205 explains that

> a clear analysis requires that the various distinct ingredients of an offense be separately recognized. The ingredients, denominated "elements" in § 702–205, are the conduct, the circumstances attendant to conduct, and the results of conduct, which are specified in the definition of an offense and which negative a defense on the merits.
>
> The effect of including within the definition of "element" facts (conduct, attendant circumstances, results) which negative a defense on the merits (a defense other than one based on the statute of limitations, lack of venue, or lack of jurisdiction) is to postulate an equivalence of the state of mind required to establish a particular offense regardless of the diverse circumstances giving rise to the charge. Thus, if the crime of murder requires that the defendant act intentionally or knowingly with respect to each element, one who intentionally kills another, recklessly mistaken that the other's conduct threatens one's life, would not be guilty of murder, although one might be guilty of a crime requiring only recklessness. Since the defendant must act intentionally or knowingly with respect to attendant circumstances which negative the defense of self-defense, conviction for murder would fail unless it could be proven that defendant knew or believed that the defendant's assailant's conduct did not in fact threaten serious bodily harm or death.

Identifying the material elements of an offense is necessary because, pursuant to HRS §§ 702–204 and 702–206 (1993), the states of mind required for culpability of an offense are defined in relation to each material element of an offense:

§ 702–204 **State of mind required.** Except as provided in section 702–212, a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense. When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly.

§ 702–206 **Definitions of states of mind.** (1) "Intentionally."

(a) A person acts intentionally with respect to his [or her] conduct when it is his [or her] conscious object to engage in such conduct.

(b) A person acts intentionally with respect to attendant circumstances when he [or she] is aware of the existence of such circumstances or believes or hopes that they exist.

(c) A person acts intentionally with respect to a result of his [or her] conduct when it is his [or her] conscious object to cause such a result.

(2) "Knowingly."

(a) A person acts knowingly with respect to his [or her] conduct when he [or she] is aware that his [or her] conduct is of that nature.

(b) A person acts knowingly with respect to attendant circumstances when he [or she] is aware that such circumstances exist.

(c) A person acts knowingly with respect to a result of his [or her] conduct when he [or she] is aware that it is practically certain that his [or her] conduct will cause such a result.

(3) "Recklessly."

(a) A person acts recklessly with respect to his [or her] conduct when he [or she] consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature.

(b) A person acts recklessly with respect to attendant circumstances when he [or she] consciously disregards a substantial and unjustifiable risk that such circumstances exist.

(c) A person acts recklessly with respect to a result of his [or her] conduct when he consciously disregards a substantial and unjustifiable risk that

his [or her] conduct will cause such a result.

(d) A risk is substantial and unjustifiable within the meaning of this section if, considering the nature and purpose of the person's conduct and the circumstances known to him [or her], the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

(4) "Negligently."

(a) A person acts negligently with respect to his [or her] conduct when he [or she] should be aware of a substantial and unjustifiable risk taken that the person's conduct is of the specified nature.

(b) A person acts negligently with respect to attendant circumstances when he [or she] should be aware of a substantial and unjustifiable risk that such circumstances exist.

(c) A person acts negligently with respect to a result of his [or her] conduct when he [or she] should be aware of a substantial and unjustifiable risk that his [or her] conduct will cause such a result.

(d) A risk is substantial and unjustifiable within the meaning of this subsection if the person's failure to perceive it, considering the nature and purpose of his [or her] conduct and the circumstances known to him [or her], involves a gross deviation from the standard of care that a law-abiding person would observe in the same situation.

The Commentary on HRS § 702–204 discusses the importance of breaking down an offense into its material elements as follows:

Clear analysis requires that the various distinct ingredients of an offense be separately recognized and that culpability be required as to each. These distinct ingredients are (1) the conduct, (2) the attendant circumstances, and (3) the results of conduct, which are specified in the definition of an offense and which negative a defense on the merits. Section 702–205

denominates these ingredients as "elements." The analytical effect of requiring a culpable state of mind with respect to each element should be obvious. For example, one who intends sexual intercourse with a female whom he has no reason to suspect is not qualified to consent to the behavior should not be held to have committed an offense because he intends the act.

The distinct punitive nature of the penal law dictates that its sanction be reserved for those individuals who can be morally condemned. The penal law does not, in most instances, condemn a person's conduct alone. Rather, it condemns the individual whose state of mind with regard to the individual's conduct, attendant circumstances, and the result of the individual's conduct, exhibits an intent to harm, an indifference to harming, or a gross deviation from reasonable care for protected social values. Thus we have limited penal liability to those individuals who act intentionally, knowingly, recklessly, or negligently contrary to values protected by the Code.

(Footnote omitted.)

To cover the situation where a state of mind is specified in the definition of an offense without distinguishing among the elements, HRS § 702–207 (1993) provides:

**Specified state of mind applies to all elements.** When the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears.

According to the Commentary on HRS § 702–207,

[t]his section makes it clear that the specified state of mind requirement applies to all elements of an offense. This resolves a latent ambiguity found in many penal statutes. If, for example, a statute were to make it an offense to intentionally or knowingly break and enter the dwelling of another, it is probably clear that the specified state of mind applies to entering as

well as breaking, however it should also be made clear that it applies to the attendant circumstances "dwelling of another."

The phrase "unless a contrary purpose plainly appears" is intended to allow the courts to avoid an improper result when the language of a statute fails to indicate that the specified state of mind applies to less than all elements and legislative history indicates that this was intended.

Prior Hawaii law did not recognize the principle that culpability must be proven as to each element of an offense. This stems in part from the fact that the concept of "elements of an offense" had not been fully explored. A case involving a charge of contributing to the delinquency of a minor stated by way of dictum that culpability with respect to the age of the victim did not have to be proven. To the extent that this section modifies the previous law, it merely rejects those few instances where absolute penal liability was imposed indirectly.

(Footnote omitted.)

While the material elements analysis employed by the Hawaii Penal Code is conceptually simple, it is often difficult to apply. Part of the difficulty lies in the Code's failure to define the "attendant circumstances" and "results of conduct" elements of an offense. As Jane A. Grall and well-known criminal law professor Paul H. Robinson observed in an article on element analysis under the Model Penal Code:

> A major defect of the Model Penal Code is its failure to define adequately the three kinds of objective elements of an offense— that is, to distinguish conduct, circumstance, and result elements. For example, is "obstructs" a conduct or a result element? Does "insults another in a manner likely to provoke violent response" consist of a single conduct element or of one conduct element and one or more circumstance elements? Does "the death of another human being" consist of a single result element or of a result element and a circumstance element?
>
> Precise definitions of these three categories are important because such categories

are used as terms of art in many places in the Code. Perhaps even more important, a precise definition is essential for proper application of the defined culpability terms. For example, to act "purposely" [7] with respect to "conduct" or in causing "a result," an actor must have such elements as his conscious object; but to act "purposely" with respect to "an attendant circumstance," an actor need only be aware of such circumstance or hope that it exists. Because of this asymmetry in the definitions of culpability as to different kinds of elements, the classification of an element becomes critical. The precise culpability requirements cannot be determined until each objective element of an offense definition is properly characterized as involving either "conduct," "an attendant circumstance," or "a result." The Code does not define "result" or "circumstance." It defines "conduct," but uses seemingly contradictory forms of that term in different Code provisions.

. . . .

> Difficulties in distinguishing conduct, circumstance, and result elements also arise because most modern codes, including the Model Penal Code, uses terms that combine "conduct" and "result" or "conduct" and "circumstance" elements. Verbs like "damages," "obstructs," "destroys," "falsifies," "kills," and "desecrates" all combine both an act and a result of that act. Verbs like "compels," "agrees," and "removes" all combine both conduct and circumstance elements. Such combinations create ambiguities and undermine consistency in the operation of the Code.

Paul H. Robinson and Jane A. Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond*, 35 Stan. L.Rev. 681, 706–07, 709 (1983) (footnotes omitted; footnote added).

2. *The Material Elements of the Offense of Disorderly Conduct Based on Unreasonable Noise*

 The offense of disorderly conduct based on unreasonable noise exemplifies the

---

7. The Hawaii Penal Code uses the term "intentionally" instead of the term "purposely" that is used in the Model Penal Code.

difficulties that Professor Robinson and Ms. Grall discuss in their article. The offense is defined in HRS § 711–1101, in relevant part, as follows: [8]

> **Disorderly conduct.** (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person:
>
> . . . .
>
> (b) Makes unreasonable noise[.]
>
> . . . .
>
> (2) Noise is unreasonable, within the meaning of subsection (1)(b), if considering the nature and purpose of the person's conduct and the circumstances known to the person, including the nature of the location and the time of the day or night, the person's conduct involves a gross deviation from the standard of conduct that a law-abiding citizen would follow in the same situation; or the failure to heed the admonition of a police officer that the noise is unreasonable and should be stopped or reduced.
>
> . . . .
>
> (3) Disorderly conduct is a petty misdemeanor if it is the defendant's intention to cause substantial harm or serious inconvenience, or if the defendant persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a violation.

"Public" is defined as "affecting or likely to affect a substantial number of persons." HRS § 711–1100 (1993).

Discerning, from the foregoing language, (1) what constitutes the prohibited conduct, attendant circumstances, and results of conduct elements of the offense; and (2) what state of mind applies to each element can be a hair-pulling exercise.

### (a) *The Conduct Element*

As noted above, HRS § 701–118 defines "[c]onduct[,]" as used in the Hawaii Penal Code, as "an act or omission, or, where rele-

vant, a series of acts or a series of omissions, or a series of acts and omissions[.]" "Act" is defined as "a bodily movement whether voluntary or involuntary[,]" while "[o]mission" is defined as "a failure to act[.]"

Based on the foregoing definitions, the conduct element of an offense refers to either the actual bodily movement of an actor that is proscribed by the definition of an offense, or the failure by an actor to act when required to do so. Indeed, the Hawai'i Supreme Court has stated that "[a]ny voluntary act . . . or omission may satisfy the conduct element of the offense." *State v. Aganon*, 97 Hawai'i 299, 303, 36 P.3d 1269, 1273 (2001). Applying these definitions to HRS § 711–1101, the conduct element of the offense is "[m]akes[.]"

### (b) *The Results–of–Conduct Element*

The word "result" is defined as "something that results as a consequence, issue, or conclusion[.]" Merriam–Webster's Collegiate Dictionary 996 (10th ed.2000). Applying this definition, the results-of-conduct element of an offense refers to the specific consequence or conclusion that results from a defendant's conduct.

In the case of the offense of disorderly conduct based on unreasonable noise, the results-of-conduct element under HRS § 711–1101 is "noise."

### (c) *The Attendant–Circumstances Element*

Any circumstances defined in an offense that are neither conduct nor the results of conduct would, by default, constitute attendant-circumstances elements of the offense. In the case of the offense of disorderly conduct based on unreasonable noise, there is one attendant-circumstances element: unreasonable noise. Pursuant to HRS § 711–1101(2),

> [n]oise is unreasonable, within the meaning of subsection (1)(b), if considering the nature and purpose of the person's conduct and the circumstances known to the per-

---

8. HRS § 711–1101 was amended in 2003, but the change is not relevant to the present appeal.

HRS § 711–1101 (Supp.2004).

son, including the nature of the location and the time of the day or night, the person's conduct involves a gross deviation from the standard of conduct that a law-abiding citizen would follow in the same situation; or the failure to heed the admonition of a police officer that the noise is unreasonable and should be stopped or reduced.

### 3. *The Requisite State of Mind*

■ HRS § 711–1101 specifies the requisite state of mind necessary to convict a person of disorderly conduct based on unreasonable noise. "A person commits the offense of disorderly conduct if, *with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof,* the person . . . [m]akes unreasonable noise[.]" (Emphasis added.) Pursuant to HRS § 702–207, this state of mind is thus applicable to the conduct, results-of-conduct, and attendant-circumstances elements of the disorderly conduct offense.

### 4. *Whether Sufficient Evidence Was Adduced of the Material Elements of Disorderly Conduct Based on Unreasonable Noise*

■ We turn now to whether substantial evidence was adduced of each material element of the offense of disorderly conduct based on unreasonable noise to support Moser's conviction.

The State was required to establish that Moser, (1) with intent to cause physical inconvenience or alarm by a member of members of the public, or recklessly creating a risk thereof, (2) engaged in a voluntary act to make (3) noise that (4) was unreasonable. There clearly was evidence that Moser made noise on the day in question. The dispositive issues are whether there was substantial evidence that Moser made "unreasonable noise" and acted with the requisite intent as to all of the elements.

### (a) *The Unreasonable–Noise–Attendant–Circumstances Element*

Unreasonable noise requires a *gross deviation* from the ordinary standards of behavior.

HRS § 711–1101(2). "Gross deviation" is not defined in the disorderly conduct statute, nor does Hawai'i case law explain the meaning of the term. *See State v. Najibi,* 78 Hawai'i 282, 284, 892 P.2d 475, 477 (App.1995) (mentioning gross deviation standard but not discussing it). *Black's Law Dictionary* defines "gross" as "[o]ut of all measure; beyond allowance; flagrant; shameful; as a gross dereliction of duty, a gross injustice, gross carelessness or negligence. Such conduct as is not to be excused." *Black's Law Dictionary* 702 (6th ed.1990) (citation omitted). *See also State Bd. of Dental Exam'rs v. Savelle,* 90 Colo. 177, 8 P.2d 693, 696 (1932) (adopting above definition of "gross").

In *State v. Nakasone,* 1 Haw.App. 10, 612 P.2d 123 (1980), this court was called upon to determine whether the record supported the defendant's conviction for disorderly conduct based on unreasonable noise. The record indicated that the defendant, while in a crowded restaurant, kept approaching customers' tables and talking to the customers loudly. *Id.* at 11, 612 P.2d at 123. A police officer who had gone into the restaurant to get a cup of coffee approached the defendant to tell the defendant to stop bothering the customers. *Id.* at 11, 612 P.2d at 123–24. The defendant then started to yell, and when the officer told the defendant to quiet down, the defendant responded that the officer could not tell him to be quiet. *Id.* at 11, 612 P.2d at 124. When the defendant continued yelling, he was arrested for disorderly conduct. *Id.* In reversing the conviction, this court held:

> On the record before us, we hold that the State failed to show that defendant made unreasonable noise. . . . The record does not contain substantial evidence to support a finding that his conduct involved a "gross" deviation from the standard of conduct that a law-abiding citizen would follow in the same situation.

*Id.* at 12, 612 P.2d at 124 (footnote omitted).

In this case, the district court based its conviction of Moser on findings that Moser's voice was louder than normal for a library, Moser refused to lower her voice when requested to do so, a public library is normally

a quiet place, and Moser refused to leave the library when directed to do so. The district court did not specifically find that Moser's behavior on the day in question constituted a "gross deviation" from the standard of conduct that a law-abiding citizen would follow in the same situation, a necessary requirement of the conduct element of unreasonable noise. Based on our review of the record, we cannot conclude that Moser's conduct met this standard.

While Moser may have raised her voice and become visibly agitated at Paik on the day in question, the evidence indicated that there was perhaps one other patron in the library that day. Additionally, no physical disruption of library services was caused by Moser's raising her voice. Far more egregious behavior has been held insufficient to support a disorderly conduct conviction. *See, e.g., State v. Faulkner,* 64 Haw. 101, 637 P.2d 770 (1981); *State v. Leung,* 79 Hawai'i 538, 904 P.2d 552 (App.1995); *State v. Najibi,* 78 Hawai'i 282, 892 P.2d 475 (App.1995).

### (b) *Moser's Intent*

In order to convict Moser of disorderly conduct based on unreasonable noise, the State was also required to prove that Moser "acted with the intent to cause physical inconvenience to, or alarm by, a member or members of the public, or that [she] acted with reckless disregard that [her] conduct might produce such a result." *Faulkner,* 64 Haw. at 104, 637 P.2d at 773 (1981). The district court did not enter a finding as to this element. Based on our review of the record and relevant case law, we agree with Moser that there was insufficient evidence to support such a finding.

Hawai'i's appellate courts have, on several occasions, reversed disorderly conduct convictions based on the State's failure to prove a defendant's intent to cause physical inconvenience or alarm by a member or members of the public or recklessly creating a risk thereof.

For example, in *Faulkner,* the defendant was arrested for disorderly conduct after yelling and swearing at police officers who responded to his call for assistance at the Honolulu Zoo. The evidence indicated that the defendant was talking and arguing with the officers in a loud voice, attracting the attention of passersby and others waiting at the bus stop across the street. *Faulkner,* 64 Haw. at 102–03, 637 P.2d at 772–73. The Hawai'i Supreme Court held that there was insufficient evidence to prove that the defendant's behavior had caused or threatened physical inconvenience or alarm by members of the public:

> [T]here has been no evidence presented by the State that the defendant's conduct had the effect of causing actual physical inconvenience to any member of the public. Neither, in the circumstances, was it likely that any member of the public would have been physically disturbed or alarmed by the noise created by the defendant. Pedestrians stopping of their own volition to satisfy their curiosity, or motorists slowing down for the same reason, cannot be said to be physically inconvenienced or alarmed within the meaning of the statute. Moreover, it is not even clear from the record whether it was the *loudness* of the defendant's voice or whether it was the presence of four uniformed police officers and their vehicles at the scene that was drawing people's attention to the area. Probably, it was a combination of both.

> It is obvious from the arresting officer's own testimony that it was the belligerent attitude and the language used by the defendant which was the officer's real concern. When asked about the proximity of onlookers to the scene, the officer replied that they were close enough to be *offended* by the defendant's conduct. While this was a proper subject for concern on the part of the police, it was not the type of conduct towards which the unreasonable noise provision of the statute was directed. Belligerency, when combined with persistently outrageous and abusive conduct, which unreasonably interferes with an officer's performance of his official duties, may supply the basis for a charge of harassment under HRS § 711–1106. *See State v. Vance,* 61 Haw. 291, 602 P.2d 933 (1979); *State v. Hopkins,* 60 Haw. 540, 592 P.2d 810 (1979). Coarse and obscene language directed at a member of the public,

which is likely to provoke a violent response, may also furnish the basis for a charge under HRS § 711–1101(1)(c). *See State v. Jendrusch*, [58 Haw. 279, 567 P.2d 1242 (1977) ]. But neither course of conduct would constitute disorderly conduct under the provisions of HRS § 711–1101(1)(b). *Id. Cf. State v. Nakasone*, 1 Haw.App. 10, 612 P.2d 123 (1980) (individual loudly arguing with a police officer in a fairly crowded restaurant, thereby causing a crowd to gather, was found from the evidence not to have been making an unreasonable noise within the meaning of the statute, or to have physically inconvenienced a member of the public or threatened to do so.)

*Faulkner*, 64 Haw. at 104–06, 637 P.2d at 773–74 (footnote omitted).

Similarly, in *Leung*, 79 Hawai'i 538, 904 P.2d 552 (App.1995), this court reversed the disorderly conduct conviction of the defendant, who had loudly and repeatedly yelled and cursed at a theater manager and the police officers who showed up at a movie theater lobby in response to a call from the theater's manager. In reversing the defendant's conviction, this court said:

> HRS § 711–1101 "requires proof of an intent to cause physical inconvenience or alarm to the public or at least a reckless creation thereof." Commentary to HRS § 711–1101 (1993). *See also State v. Nakasone*, 1 Haw.App. 10, 612 P.2d 123 (1980). Such "intent, or recklessly creating a risk of the prohibited consequences, is an essential ingredient of the conduct proscribed by the statute." *Nakasone*, 1 Haw.App. at 13, 612 P.2d at 124. *Accord State v. Jendrusch*, 58 Haw. 279, 281–82, 567 P.2d 1242, 1244 (1977). While a defendant's state of mind can rarely be proved by direct evidence, "the mind of an alleged offender may be read from his or her acts or conduct and the inferences fairly drawn from all of the circumstances." *State v. Sadino*, 64 Haw. 427, 430, 642 P.2d 534, 537 (1982).

Here, Defendant was detained in the theater lobby area. The crowd outside the theater was not attracted to the area by Defendant but was awaiting the start of the second showing of the movie. The crowd inside the theater was leaving the theater because the movie had ended. The fact that the crowd inside was moving slowly was to be expected in light of the number of people exiting the theater at the same time. While some of the patrons may have turned to "see what was going on," the Hawai'i Supreme Court has noted that "pedestrians stopping of their own volition to satisfy their curiosity cannot be said to be physically inconvenienced or alarmed." *Faulkner*, 64 Haw. at 105, 637 P.2d at 774. Similarly, theater patrons waiting for or exiting a movie who, of their own volition, stop or slow down to satisfy their curiosity about an encounter between Defendant and the police in a theater lobby cannot be said to be physically inconvenienced or alarmed.

Further, it is unclear from the record whether it was the action of Defendant or whether it was the presence of the four uniformed police officers and their vehicles at the scene that drew the crowd's attention. Wong specifically testified that it was the arrival of the police cars that attracted her to the "front of the theater to see" what was happening. It is reasonable to infer that the police officers' presence attracted the crowd's attention. *See id.*

There is no evidence that Defendant caused physical inconvenience to any member of the public or that the public was alarmed because at the time he allegedly made "unreasonable noise," he was under the control of the four police officers and the theater manager. Although people slowed down, they moved on when told by the police, "there's nothing to see." In *Jendrusch*, 58 Haw. at 282, 567 P.2d at 1244, the court pointed out that in amending the Hawai'i Penal Code in 1973, "the Legislature emphasized that mere *public* inconvenience, annoyance or alarm was insufficient to impose penal liability. There must have been the intent by the defendant to cause *physical* inconvenience to, or alarm by, a member or members of the public." (Emphases in original.) Assuming there was some inconvenience or alarm, there was clearly "no *physical* inconvenience or alarm" to any members of the public, nor do these surrounding cir-

cumstances give rise to the creation of a risk thereof.

In this case, Officer Valentino testified that he and Officer Johnson walked into the theater "together." Contradicting Officer Johnson's testimony, Officer Valentino indicated on cross-examination that when he arrived, most of the moviegoers had exited the theater and, excluding the four officers and Defendant, there were "maybe four or five" people remaining. He estimated the exchange between the officers and Defendant to have been brief, "maybe five minutes." Officer Valentino's testimony does not support any inference that Defendant's actions caused or created a risk of physical inconvenience or alarm by the public. No evidence was offered to show that Defendant specifically had the intent to produce the particular prohibited effect under HRS § 711–1101(1), or to recklessly create a risk thereof as required under *Nakasone*.

Finally, there is no evidence that Defendant addressed anyone other than the manager and the police. The State's brief, itself, states that "Defendant's conduct was directed at the theater manager, as well as the officers," and that Defendant "acted belligerently" and in a "loud, disorderly" voice. Officer Johnson plainly indicated that he arrested Defendant after Defendant ignored his warning regarding Defendant's repeated use of profanity at him and the other officers. This type of conduct is not an adequate basis for a charge under HRS § 711–1101, but would rather constitute a possible charge under HRS § 711–1106. It [79 Hawai'i at 545, 904 P.2d 552] is established that "belligerency, when combined with persistently outrageous and abusive conduct, which unreasonably interferes with a police officer's performance of his [or her] duties, may supply the basis for a charge of harassment under HRS § 711–1106[,]" but not a charge of disorderly conduct. *Faulkner*, 64 Haw. at 105, 637 P.2d at 774. *See also Vance, supra.* The officers' testimonies indicated that all of Defendant's statements pertained to Defendant's belief that he was being unjustly detained and that the alleged profanity was aimed only at the officers and the

manager, not at the public or any member of the public generally. *See* discussion in Part III, *supra*. We recently reversed a conviction for disorderly conduct under seemingly more egregious circumstances in *State v. Najibi*, 78 Hawai'i 282, 892 P.2d 475 (Haw.App.1995).

Considering Defendant's alleged acts and conduct, and the inferences to be drawn from the surrounding circumstances, we conclude that a person of reasonable caution would not believe the evidence was adequate to establish that when Defendant addressed the theater manager and the police concerning what he believed to be an unjustified detention, his intent was to cause physical inconvenience or alarm by members of the public or that he recklessly created a risk thereof.

*Leung*, 79 Hawai'i at 543–45, 904 P.2d at 557–59 (brackets, ellipses, and footnote omitted).

The district court distinguished this case from *Faulkner* and *Leung*, agreeing with the State that those cases involved arguments with the police in relatively noisy areas (the Honolulu Zoo and a busy movie theater), whereas

> [h]ere, the incident happened in an enclosed space—a library, a place of quiet, study and research. People in the library would either have to sit and listen to [Moser's] raised voice or leave the library—a definite physical inconvenience. Further, there is evidence that [Moser's] conduct in fact disturbed people—the patron in the library who later spoke to [Huber] about the incident and [Huber] himself who had to leave his office to approach [Moser].

In this case, however, Moser's behavior was considerably tamer than the behavior of the defendants in *Faulkner, Leung*, and all the other disorderly conduct cases based on unreasonable noise that have been reversed by the Hawai'i appellate courts. Additionally, there is no evidence in the record that Moser addressed anyone other than Paik and Huber on the occasion in question or intended to physically inconvenience or alarm any member of the public by speaking loudly. Indeed, it is unclear whether any other pa-

tron was in the library that day ,and, if so, whether it was the raising of Moser's voice or the dialogue between Moser and Huber that attracted the patron's attention. We therefore conclude, based on the case law, that there was insufficient evidence that Moser acted with any "intent to cause physical inconvenience or alarm by a member or members of the public[.]"

## CONCLUSION

In light of the foregoing discussion, we reverse the Judgment entered on February 2, 2005 that convicted Moser of, and sentenced her for, disorderly conduct, in violation of HRS § 711–1101. Inasmuch as the record indicates that Moser may have paid the fines and costs assessed as part of her sentence, we remand this case to the district court for reimbursement to Moser of any amounts she has paid pursuant to the Judgment.